UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>1617 JFK Boulevard, Suite 520<br>Philadelphia, PA 19103,<br><br>                  Plaintiff,<br><br>         v.<br><br>HUNTER HAITHCOCK<br>a/k/a Hunter Elliot and Hunter<br>  Allen Haithcock,<br>2810 Selwyn Avenue, Unit 321<br>Charlotte, NC 28209,<br><br>                  Defendant. | Civil Action No. 1:24-cv-2585<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendant Hunter Haithcock, a/k/a Hunter Elliott and Hunter Allen Haithcock ("Haithcock"), and alleges as follows:

**SUMMARY**

1. Beginning in September 2019 and through at least November 2022, Haithcock, while acting as an unregistered investment adviser, fraudulently induced at least 50 individuals into investing over $520,000 with him by posing as a licensed securities professional associated with a registered broker-dealer and investment adviser. He promised that clients' investment principal was guaranteed and offered exorbitant returns on their investments.

2. Haithcock fraudulently induced clients to invest in his scheme by feigning professional credentials, fabricating account opening documents, and opening personal accounts with the company through which he claimed to have an affiliation.

3. To attract clients, he relied on word-of-mouth referrals, meeting and pitching prospective clients in-person or by text.

4. In reality, Haithcock -- who has never held any securities license and or been associated with any broker-dealer, investment adviser or other entity registered with the Commission -- never traded any securities on behalf of the clients who invested funds with him.

5. Instead, Haithcock deposited the funds into his personal accounts and then fraudulently used the money with which he was entrusted for his own benefit, such as for credit card payments, food and other personal expenses.

6. Haithcock also furthered and concealed his fraudulent scheme by making false representations to his clients about his trading activity and their investment returns and by providing clients with falsified account statements showing fictitious investment activity and account performance.

7. From time to time, in a Ponzi-like fashion, Haithcock also used new client funds to repay prior clients, making himself seem successful.

8. Later in the scheme, Haithcock transferred client funds to his personal brokerage accounts, which he used to engage in largely unsuccessful day trading for himself.

9. Ultimately, Haithcock violated the securities laws by fraudulently obtaining over $520,000 in funds from at least 50 clients, most of whom sustained significant losses, as detailed further below.

10.     By engaging in the conduct alleged, Haithcock violated and, unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

11.     Based on these violations, the Commission seeks: (a) permanent injunctions; (b) disgorgement of Haithcock's ill-gotten gains, plus prejudgment interest; (c) civil penalties due to the egregious nature of Haithcock's violations; and (d) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § § 77t(b) and 77t(d)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. § § 78u(d) and 78u(e)], and Section 209(d) of the Advisers Act [15. U.S.C. §80b-9(d)].

13.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. § §  77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa(a)], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].  Haithcock has, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of facilities of a national securities exchange in connection with the acts, practices, and course of business alleged in this Complaint.

14.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of

the Advisers Act [15 U.S.C. § 80b-14]. Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within Maryland, including that Haithcock resided within the District during the relevant time period and made misrepresentations to clients residing within this District.

## DEFENDANT

15.     Hunter Haithcock, age 23, is a former resident of Aberdeen, Maryland and currently resides in Charlotte, North Carolina. Despite holding himself out as an investment adviser and/or "broker," Haithcock has never held a securities license or been associated with any entity registered with the Commission.

## FACTS

**A.     Haithcock Pretends To Be A Successful Investment Adviser And Broker
        And Falsifies Bank Account Documentation In Furtherance Of His Scheme**

16.     Beginning in September of 2019, Haithcock solicited those in his social circle, including friends, coworkers, and churchgoers, to invest money with him by falsely claiming to be a registered investment professional with or otherwise have an affiliation with Company A, a well-known registered brokerage firm.

17.     Specifically, Haithcock solicited investments by falsely holding himself out as a licensed securities professional with a "CFA" [Chartered Financial Analyst] credential affiliated with Company A. He also claimed to be working under another individual, "Individual A." Individual A is an actual registered representative, formerly employed by Company A in Chicago, Illinois, from February 2020 to October 2021.

18.     For instance, in February 2021, Haithcock texted a prospective client, "I'm a full time day trader and client investment adviser with [Company A] Series 63/SIE under Adviser [Individual A] CRD#[redacted]."

19. In November 2021, Haithcock texted another prospective client, "I'm a [Company A] Client investment advisor under my Brokerage Advisor [Individual A] CRC[sic]#[redacted], are you familiar with [Company A]."

20. Haithcock was never affiliated with or employed by Company A.

21. Haithcock has never taken a securities license exam or been associated with any broker-dealer or investment adviser.

22. Individual A does not know Haithcock nor did that individual ever work with Haithcock at Company A.

23. After making the fraudulent representations, Haithcock provided prospective clients with a falsified Company A Client Agreement form to create the illusion that he was associated with Company A with the ability to buy and sell stocks for a fee for clients.

24. On information and belief, Haithcock downloaded an actual Company A Client Agreement, available on Company A's website, altering parts of it, and passing it off as a legitimate agreement.

25. Haithcock altered the name of the document from "Client Agreement" to "Client Broker Agreement" (the "Client Broker Agreement") and inserted one of his aliases, Hunter Elliott, and his home address of Aberdeen, Maryland on the top of the form.

26. Below this, Haithcock inserted a client signature line and broker signature line. He signed his name as "Hunter Elliott" and typed "HUNTER ELLIOTT 'Company A Broker'" below his signature. At the bottom of the page, Haithcock inserted the following language in bold:

> THIS AGREEMENT IS A CONFIRMATION TO INVEST UNDER BROKER 'Hunter Elliott' YOU WILL RECEIVE A [Company A] RECEIPT OF THE FUNDS YOU INVEST WITH [Company A] BROKER 'Hunter Elliott.'

27. For most of his clients, Haithcock provided the Client Broker Agreements to clients via email and asked each client to, "review, sign, and complete this document."

28. For some clients, Haithcock modified an actual form Company A Deposit Slip (non-IRAs) ("the Deposit Slip") downloaded from Company A's website with the client's name, amount of investment, a false account number, and the ticker symbols of the securities he claimed he would purchase.

29. Haithcock then emailed the fraudulent Deposit Slip to the client for an electronic signature.

30. Then Haithcock provided the client with wire instructions that included account and routing numbers as well as the direction to include references in the memo line to accounts that ultimately belonged to Haithcock.

31. Haithcock's use of falsified account documentation in the name of Company A fraudulently induced his clients to invest funds with him under the impression that they were opening a brokerage or investment account with Company A.

B. **Haithcock Makes False Statements About The Safety Of The Funds Invested And Boasts About The Expected Returns To Clients**

32. As Haithcock lured potential clients, he falsely made misrepresentations that he guaranteed investors their principal investment and was engaging in highly profitable trading activity on their behalf that would result in exorbitant profits generated over the lifetime of the investment.

33. Generally, Haithcock requested that clients make a minimum investment of $5,000 and keep their money with him for at least 1 to 5 years (the "required time period").

34. Haithcock also encouraged clients to contribute above this $5,000 minimum in their initial investment by highlighting his purported "no loss guarantee" by which he assured clients that he would return their initial investment regardless of amount and market performance.

35. Haithcock made these promises orally, in text messages and in the falsified Client Broker Agreement, while encouraging his victims to give him as much money up front as they could. To emphasize this misrepresentation, he inserted the following language in bold at the end of the sham Client Broker Agreement:

> DISCLOSURE: *THIS AGREEMENT IS A NO LOSS GUARANTEE. MEANING THE INITIAL INVESTMENT IS SECURED AND AT ANY TIME THE MARKET HAS A CRASH THERE IS NO LOSS TO YOU.*

36. Haithcock told clients that, provided they kept their funds with him for the required time period, they would only incur capital gains and loss taxes, Company A fees, and an 8% "brokerage fee" on the total account value that would only be payable upon withdrawal.

37. To entice clients to invest funds and to inspire confidence in his investment strategies, he often texted fictitious and exorbitant return projections of his purported future trades.

38. One such text Haithcock sent a prospective client in November 2021 read:

> AVERAGE YEARLY EXPECTED RETURN:
> 2:1 – 0.5 RISK LEVEL (MEDIUM:HIGH) NO REINVESTMENTS/RELINQUISHED EQUITY
> ***No including Compound gains and tax appropriations****
>
> $5,000 INVESMENT
> YEAR 1
> $9,700
> YEAR 2
> $16,562
> YEAR 3
> $31,147

YEAR 4
$57,311
YEAR 5
$71,804

39.     As word of Haithcock's investment opportunity spread through the family and friends of his clients, more and more clients invested with Haithcock.

C.  **Haithcock Opens Personal Accounts To Deposit Client Funds And Misleads Investors Into Believing Funds Are Deposited On Their Behalf**

40.     At the outset of Haithcock's scheme, he deposited client funds in a personal savings account he opened in his own name on July 1, 2019, with Company B. Haithcock transferred client funds from his savings account with Company B to a checking account he opened in his own name on July 25, 2019, with Company C, an entity with an ownership interest in Company A.

41.     In furtherance of his fraudulent scheme, on February 24, 2020, Haithcock then opened two personal accounts with Company C in the name of Hunter Allen Haithcock using his address in Aberdeen, Maryland.

42.     Haithcock used his personal accounts with Company B and Company C to receive wire transfers directly from his clients.

43.     For example, Client 1 was introduced to Haithcock through an employer who previously invested money with Haithcock and claimed to have made a profit.

44.     Haithcock sent Client 1 a falsified Client Broker Agreement, as detailed above, purporting to be a "broker" with Company A.

45.     After executing the Client Broker Agreement that Haithcock falsified, Client 1 wrote a check to Haithcock for a $5,000 investment, which was dated December 29, 2020. Haithcock deposited it in his personal account with Company B.

46. Haithcock also sent a fabricated Client Broker Agreement to Client 2, who was introduced to Haithcock through family members who knew Haithcock. Client 2 signed the Client Broker Agreement in February 2021.

47. On or about February 2021, Client 2 initially invested $50,000 via wire transfer to Haithcock, which he deposited in his personal account with Company C that Client 2 believed to be an investment account opened by Haithcock on Client 2's behalf. Haithcock provided the client with wire instructions and the direction: "[P]LEASE ADD PORT MEMO VERY IMPORTANT! (XXXXXXXXXXX SIE)".

48. Unbeknownst to Client 2, the wire instructions and memo line directed all funds to Haithcock's personal account with Company C.

49. In November 2021, Haithcock texted Client 3, who was introduced to Haithcock through another of Haithcock's clients, that $5,000 was his current minimum investment. Haithcock stated that he preferred investments to be long term and kept up to 5 years. Haithcock falsely advised Client 3 that he could expect a 40-140% return on his investment in one year. Client 3 then invested $5,000 on or about November 23, 2021 with Haithcock, which Haithcock also deposited into his personal account with Company C.

50. Haithcock advised Client 3 that he would do an internal transfer from Haithcock's Company C account to an account he would open with Company C on behalf of Client 3. That never occurred.

51. In total, at Haithcock's direction, the defrauded investors sent over $308,000 to Haithcock's two personal accounts with Company C, and over $164,000 to Haithcock's personal savings account with Company B. Clients also gave Haithcock funds in cash and through electronic payments, such as Venmo, Zelle and CashApp, for the purpose of investment.

**D.      Haithcock Makes False Representations About The Status Of The Investments**

52.     Haithcock lulled his clients and induced them to invest even more funds by creating false account statements that showed profitable trading and concealed his misappropriation of funds.

53.     On a periodic basis, Haithcock also emailed or texted clients a "Statement Report" or a "Summary Report" with their purported balance, a summary of supposed recent investment activity, and a summary of market conditions.  These reports were signed "Hunter Elliott, IA Investment Strategist," "Hunter Elliott, CFA Investment Advisor," or "Hunter."  None of the purported trading activity had occurred.

54.     For instance, Haithcock texted Client 1 falsified information about the returns on Client 1's investment throughout 2021.  Believing the investment was profitable and the principal was secure, Client 1 then invested over $14,000 in additional money with Haithcock, through cash and via Venmo, including transfers directly to Haithcock's Venmo account on January 20, 2021, April 23, 2021, October 7, 2021, and April 7, 2022.

55.     As another example, on October 9, 2021, Haithcock emailed Client 2 a "Statement Report" purporting to show over $80,000 in funds available – a $30,000 gain from his $50,000 initial investment.  This was false.  There had been no trading and no gains.  Believing Haithcock's representation that he was earning significant returns, Client 2 invested an additional $40,000 in July 2021 and an additional $20,000 in February 2022, for a total investment of $110,000 that was transferred to Haithcock's personal account with Company C.

56.     Similarly, on February 8, 2022, Client 3, who as noted above previously invested $5,000 with Haithcock, received an email from Haithcock, which was titled "Statement Report: 1/21/22 – 2/2/22" and purported to show a balance of $7,984.58 based on supposed trading

profits. But Haithcock made no investments of any kind on Client C's behalf and earned no profits. The Statement Report was a complete fabrication. The Statement Report was signed by "Hunter Elliott, CFA, Investment Advisor." He also advised that going forward reports would be sent on a biweekly basis.

57. Client 3's report showed that 10% of the funds were invested in a money market account and 90% of their funds were invested in options. The report also claimed that the month's most profitable trades were in the following stocks (identified by ticker symbol): TSLA, SPY, AMD, NVDA and MRNA.

58. Given the purportedly rapid growth shown in that report generated by Haithcock, as well as in a Statement Report, dated April 29, 2022, which reflects a balance of $9,367.95, signed by "Hunter Elliott, IA, Investment Strategist", Client 3 liquidated his 401(k) account and wired an additional $40,000 to Haithcock's account with Company C in May 2022 and another $5,000 to the same account in June 2022, for a total investment of $50,000.

59. These "Statement Reports" were entirely fictional, as Haithcock did not invest any of the funds he received from Clients 1, 2 or 3 or from any other clients. Instead, Haithcock simply fabricated the return-on-investment information, including the Statement Reports and Summary Reports that falsely showed investments and phenomenal returns.

E.      **Haithcock Misappropriates The Funds Of His Purported Clients**

60. Contrary to what Haithcock promised, he never deposited any of the funds with which his purported clients entrusted him into an account with Company A to be used for the benefit of clients or to purchase securities for their benefit.

61. Instead, Haithcock kept and/or directed all client funds to his personal accounts, including bank accounts with Company B and Company C.

62. Haithcock made frequent transfers of the funds among his accounts to pay for personal expenses, such as credit card payments, food purchases, and Zelle payments to himself.

63. At all times, Haithcock acted knowingly or recklessly in committing his fraud through fabricated documents he created and false statements orally and in writing. He also knew, or was reckless in not knowing, that his false statements regarding his credentials, his guarantees, and his supposed trading profits were material to his clients.

64. By holding himself as an investment adviser who actively managed investors' money in return for a fee, Haithcock met the definition of an investment adviser under the Advisers Act. Thus, Haithcock owed his clients fiduciary duties.

65. Haithcock breached his fiduciary duties to his clients through his fraudulent scheme to misappropriate his clients' money while lulling them with false performance statements and attempting to induce further investment.

66. In furtherance of his scheme, Haithcock used a small portion of the client funds he received to pay back some investors to support the illusion that he was generating trading profits. In particular, he made payments at the outset of the scheme, which appeared to bolster the incredible opportunity he presented and increased the word-of-mouth referrals. Between August 2020 and May 2022, Haithcock made approximately $44,000 in Ponzi-like payments using client funds.

67. As the scheme progressed, beginning in May of 2021, Haithcock began using his clients' funds to engage in day trading for his own benefit, which proved to be largely unsuccessful.

68. On May 24, 2021, Haithcock opened a trading account in his own name with Company D. Haithcock then used this account primarily to engage in day trading.

69. Haithcock transferred client funds from his personal accounts with Company A directly to his personal Company D trading account.

70. Between May 2021 and November 2022, Haithcock transferred over $70,000 of client funds to his personal Company D trading account.

71. Haithcock subsequently lost over $55,000 of the client funds he traded on his own behalf through Company D.

72. Toward the end of the scheme, some of Haithcock's clients, including Client 1, began asking for their funds, which he had guaranteed. As Haithcock had already spent or lost the funds of most of his clients, Haithcock then falsely communicated to his clients, including Client 1, that he was in the process of returning the funds, continually providing false justifications as to why this process was stalled.

73. Instead, Haithcock eventually left the District and ceased all communication with his victims.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 17(a) of the Securities Act**

74. The Commission repeats and realleges the preceding paragraphs of its Complaint as if fully set forth herein.

75. By reason of the foregoing, Haithcock, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities has:

    (a) Knowingly or recklessly employed one or more devices, schemes or artifices to defraud;

(b) Knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) Knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

76. By reason of the conduct described above, Haithcock has violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

77. The Commission repeats and realleges the preceding paragraphs of its Complaint as if fully set forth herein.

78. By reason of the foregoing, Haithcock, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail has:

(a) employed one or more devices, schemes, or artifices to defraud;

(b) made one or more untrue statements of a material fact or has omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

  (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

79. By engaging in the conduct described above, Haithcock has violated and, unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 206(1) and 206(2) of the Advisers Act**

80. The Commission repeats and realleges the preceding paragraphs of its Complaint as if fully set forth herein.

81. At all relevant times, Haithcock was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

82. By reason of the foregoing, Haithcock directly or indirectly, and by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, as an investment adviser: (1) knowingly or recklessly employed or is employing any device, scheme, or artifice to defraud a client or prospective client; and (2) knowingly, recklessly, or negligently engaged or is engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

83. By engaging in the conduct described above, Haithcock violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

**RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court find the Defendant committed the violations alleged and enter a final judgment:

(i) permanently restraining and enjoining Haithcock, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Haithcock, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purpose and object in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)];

(ii) ordering Haithcock to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(5) and (7)];

(iii) ordering Haithcock to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)], and Section 209(e) of the Advisers Act [15 U.S.C. 80b-9(e)]; and

(iv) granting any other and further relief this Court may deem just and proper.

16

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated: September 6, 2024

    Respectfully submitted,

    SECURITIES AND
    EXCHANGE COMMISSION

    */s/ Gregory R. Bockin*
    Gregory R. Bockin (Bar No. 17993)
    Kara F. Sweet
    Kingdon Kase
    Paulina L. Jerez
    Samantha K. Keleher
    Philadelphia Regional Office
    1617 JFK Boulevard, Suite 520
    Philadelphia, PA 19103
    215.597.3100
    215.597.2740 (fax)
    BockinG@sec.gov
    SweetK@sec.gov

    *Counsel for Plaintiff Securities*
    *and Exchange Commission*